UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEAN GILBERT DEVRIES,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.,<br><br>　　　　Defendant. | Case No.  16-cv-02953-WHO<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION AND MOTION TO STAY**<br><br>Re: Dkt. Nos. 31, 33 |

## INTRODUCTION

Plaintiff Sean Gilbert DeVries brings this class action suit under the Fair Credit Reporting Act ("FCRA") and California law against defendant Experian Information Solutions, Inc. ("EIS") for its alleged failure to provide consumers with their annual free credit reports.  EIS now moves to compel arbitration on an individual basis and stay this action pending arbitration.  I find that DeVries agreed to the 2014 Terms and Conditions, which were later superseded by the 2016 Terms of Use.  Although that latter agreement carves out certain claims arising out of the FCRA, the scope and enforceability of the arbitration provision is delegated to the arbitrator.  I have jurisdiction to rule that EIS did not waive its right to arbitrate as a result of its litigation activity here.  The motions to compel arbitration and stay this action are GRANTED.

## BACKGROUND

### I.    FACTUAL BACKGROUND

#### A.    Plaintiff's Allegations

DeVries alleges that on or around September 3, 2014, he attempted to obtain a free credit report from www.annualcreditreport.com, which is operated jointly by Equifax, Inc., TransUnion LLC, and EIS.  Complaint (Dkt. No. 1) ¶ 21.  He filled out an online form requiring "his full first name and last name; his middle initial; his current address; a previous address if he had moved

United States District Court
Northern District of California

within the past two years; his full date of birth . . .; any generational information; and his Social Security number." *Id.* ¶ 22.

DeVries was then routed to www.annualcreditreport.experian.com, which is controlled solely by EIS. *Id.* There, he was required to answer additional questions, including: "the names of persons he associates with; last four digits of his checking account; names of persons he has lived with in the last ten years; and trick questions regarding non-existent mortgages." *Id.* ¶ 23. EIS then rejected his request for his free credit report, stating that it could not verify his identity. *Id.* ¶ 25. EIS requested additional identifying documents, including driver's license, state ID card, utility bill, and bank or insurance statement. *Id.*

Unable to obtain his free credit report, DeVries visited EIS's website, www.experian.com, on September 2, 2014. *Id.* ¶ 27. After providing "his first and last name, middle initial, current address, date of birth, any generational information, and Social Security name," he purchased an "Experian credit report" for $10. *Id.* ¶¶ 27-28; Declaration of David Williams ("First Williams Decl.") (Dkt. No. 34), Ex. E (Dkt. No. 34-1). He alleges that EIS "requires consumers to provide more detailed information than is required by statute to frustrate consumers into believing they cannot obtain a free Credit Report, and thus inducing them to purchase a Credit Report." Compl. ¶ 31.

### B.    2014 Terms and Conditions

"At all times in 2014, ordering an Experian credit report over the www.experian.com website required the consumer's acceptance of the Terms and Conditions." First Williams Decl. ¶ 4. When DeVries made his September 2014 purchase, "every consumer was required to complete a two-step order process comprised of order page 'Step 1 of 2' and order page 'Step 2 of 2.'" *Id.* ¶ 4. After providing a name, email, and address on the first order page, a consumer then proceeded to order page "Step 2 of 2." *Id.* ¶¶ 5-6.

On order page "Step 2 of 2," a consumer was required to enter his or her Social Security Number, birthdate, login information, and payment information. First Williams Decl., Ex. C. At the bottom of this page is the following:

Click "Submit Secure Order" to accept the Terms and Conditions above, acknowledge receipt of our Privacy Notice and agree to its terms, confirm your authorization for ConsumerInfo.com, Inc., an Experian company, to obtain your credit report and submit your secure order.

**SUBMIT SECURE ORDER** ▶

*Id.* Both the "Terms and Conditions" and "Privacy Notice" were in blue, indicating that they were active hyperlinks that the consumer could click to be directed to another webpage.  First Williams Decl. ¶ 7.  When a consumer clicked on the "Terms and Conditions" hyperlink, "an additional window would open within the consumer's web browser containing the entire text of the Terms and Conditions."  *Id.* ¶ 8.

The Terms and Conditions at the time of DeVries's purchase contained the following arbitration provision:

**DISPUTE RESOLUTION BY BINDING ARBITRATION**

PLEASE READ THIS CAREFULLY.   IT AFFECTS YOUR RIGHTS.

[. . .]

(a) CIC[1] and you agree to arbitrate all disputes and claims between us, except any disputes or claims which under governing law are not subject to arbitration.  This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us subject to arbitration to the fullest extent permitted by law.

[. . .]

For the purposes of this arbitration provision, references to "CIC," "you," and "us" shall include our respective parent entities, subsidiaries, affiliates, agents, employees, predecessors in interest, successors and assigns, websites of the foregoing, as well as all authorized or unauthorized users of beneficiaries of services, products or information under this or prior Agreements between us . . . You agree that, by entering into this Agreement, you and CIC are each waiving the right to a trial by jury or to participate in a class action . . . This arbitration provision shall survive termination of this Agreement.

[. . .]

---

[1] CIC refers to ConsumerInfo.com, Inc.  "CIC is an affiliate of [EIS]," the defendant here.  First Williams Decl. ¶ 2.  "CIC and [EIS] are both wholly-owned subsidiaries of Experian Holdings, Inc., and the parent company is Experian plc."  *Id.*  The parties do not dispute that EIS has standing to enforce this arbitration provision.

3

(f) YOU AND CIC AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.

First Williams Decl., Ex. D.

The Terms and Conditions also contain the following delegation clause:

All issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement, including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable.

*Id.*

Lastly, the Terms and Conditions state that its terms "may be updated from time to time" and "[e]ach time you order, access, or use any of the Products, Product Websites, and/or Content, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement." *Id.*

### C. 2016 Terms of Use

By April 5, 2016, before this lawsuit was filed in June 2016, EIS's website Terms of Use provided:

You agree that by creating an account with ECS . . ., or accessing or using our . . . website(s) (such as this website, https://usa.experian.com, or any affiliated website (including, but not limited to, **Experian.com, FreeCreditReport.com, FreeCreditScore.com, CreditReport.com, and CreditScore.com**)) . . ., as well as any content provided or accessible in connection with the website(s) . . ., you represent to ECS that you have read, understood, and expressly consent and agree to be bound by this Terms of Use Agreement, and the terms, conditions, and notices contained or referenced herein ("Agreement") whether you are a "Visitor" (which means that you simply browse or access a Website), or a "Customer" (which means that you have created an account with ECS, or enrolled or registered with a Website, or are accessing or using a Service). [2]

---

[2] The Terms of Use Agreement defines "ECS" as "ConsumerInfo.com, Inc., an Experian® company (also known as Experian Consumer Services), and referred to as 'Experian' on the Websites, its predecessors in interest, successors and assigns, and any of its third party service providers . . . who ECS uses in connection with the provision of the Services to you." Reese Decl., Ex. G. Also, "[f]or the purposes of the arbitration provision, references to 'ECS,' 'you,' and 'us' shall include our respective parent entities, subsidiaries, affiliates, agents, employees,

United States District Court
Northern District of California

Declaration of Michael R. Reese (Dkt. No. 43-1), Ex. G (Dkt. No. 43-9).  DeVries accessed

www.experian.com and its accompanying subpages on approximately May 18, 2016, and

September 16, 2016.  Declaration of Sean DeVries (Dkt. No. 43-11) ¶ 2.

The 2016 Terms of Use Agreement contains an arbitration provision, but includes the

following carve-out:

> [F]or the avoidance of doubt, any dispute you may have with us
> arising out of the Fair Credit Reporting Act ("FCRA") relating to the
> information contained in your consumer disclosure or report,
> including but not limited to claims for alleged inaccuracies, shall not
> be governed by this agreement.

Reese Decl., Ex. G.  Outside of this carve-out provision, the agreement to arbitrate includes

"claims that arose before this or any prior Agreement."  *Id.*  The Terms of Use also provide:

> This Agreement . . . constitute[s] the entire Agreement between ECS
> and you in connection with your account with ECS, or access or use
> of any Service or Website, and supersede[s] any prior versions of
> the terms and conditions, if applicable . . . In the event of a conflict
> between this Agreement, or any other notice, policy, disclaimer or
> other term contained in the Websites or otherwise, this Agreement
> will control.

*Id.*  The 2016 Terms of Use contain the same delegation clause as the 2014 Terms and Conditions.

In addition to the Terms of Use, the arbitration provision carve-out for disputes arising out

of the FCRA relating to information in consumer disclosures or reports is also included in an

updated version of CIC's Terms and Conditions.  *See* Reese Decl., Ex. H; Declaration of Edward

S. Chang (Dkt. No. 46-2).  The Terms and Conditions were updated in September 2015 and

published on the American Arbitration Association's (AAA) online Consumer Clause Registry on

December 23, 2015.  Chang Decl. ¶¶ 3-4.

## II.  PROCEDURAL BACKGROUND

On June 2, 2016, DeVries filed this class action suit asserting five causes of action under:

(1) the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681g(a); (2) the FCRA, 15 U.S.C.

§ 1681j; (3) the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et*

predecessors in interest, successors, and assigns, websites of the foregoing, as well as all
authorized or unauthorized users or beneficiaries of Services and/or Websites or information under
this or prior Agreements between us relating to Services and/or Websites."  *Id.*

United States District Court
Northern District of California

1   *seq.*; (4) the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*;

2   and (5) the California Consumer Credit Reporting Agencies Act, Cal. Civ. Code § 1785.1 *et seq.*

3   Complaint (Dkt. No. 1).  On August 16, 2016, EIS filed its answer, asserting 14 affirmative

4   defenses (not including arbitration) and reserving its right to assert additional defenses "as may

5   become available or apparent during the course of discovery."  Answer (Dkt. No. 26) at 17.  I

6   issued an order governing the treatment of confidential discovery.  Dkt. No. 28.  EIS now moves

7   to compel arbitration (Dkt. No. 31) and stay the action (Dkt. No. 33).  I granted EIS's request to

8   stay discovery pending the resolution of this motion.  Dkt. No. 38.[3]

9                                   **LEGAL STANDARD**

10  **I.      MOTION TO COMPEL ARBITRATION**

11         The Federal Arbitration Act ("FAA") governs the motion to compel arbitration.  9 U.S.C.

12  §§ 1 *et seq.*  Under the FAA, a district court determines (1) whether a valid agreement to arbitrate

13  exists and, if it does, (2) whether the agreement encompasses the dispute at issue.  *Lifescan, Inc. v.*

14  *Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).  "To evaluate the validity of

15  an arbitration agreement, federal courts should apply ordinary state-law principles that govern the

16  formation of contracts."  *Ingle v. Circuit City Stores, Inc.,* 328 F.3d 1165, 1170 (9th Cir. 2003)

17  (internal quotation marks and citation omitted).  If the court is "satisfied that the making of the

18  arbitration agreement or the failure to comply with the agreement is not in issue, the court shall

19  make an order directing the parties to proceed to arbitration in accordance with the terms of the

20  agreement."  9 U.S.C. § 4.  "[A]ny doubts concerning the scope of arbitrable issues should be

21  resolved in favor of arbitration[.]"  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460

22  U.S. 1, 24–25 (U.S. 1983).

23

24  [3] EIS objects to certain evidence submitted by DeVries.  The Reese Declaration, paragraph 4,
    states that Exhibit A is a copy of "Plaintiff's Response to Defendant's Discovery Request
25  (Interrogatory No. 1)."  Dkt. No. 48.  EIS contends that this statement lacks foundation and is an
    impermissible legal conclusion because EIS did not serve any formal discovery on DeVries, but
26  asked informally for his identifying information.  *Id.*  Additionally, EIS objects to the DeVries
    Declaration paragraphs 1 and 3 for lack of foundation and containing impermissible legal
27  conclusions.  Dkt. No. 49.  EIS also objects to DeVries's response to its evidentiary objections as
    untimely and an improper surreply.  These objections are all OVERRULED as moot because I do
28  not rely on any of the information underlying these objections.

United States District Court
Northern District of California

United States District Court
Northern District of California

## II.      MOTION TO STAY

Under § 3 of the FAA, "[i]f any suit or proceeding is brought in a court of the Unites States upon any issue referable to arbitration under such an agreement . . ., the court  . . . shall . . . stay the trial of the action." 9 U.S.C. § 3; *see also AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 344 (2011).  Where plaintiffs assert both arbitrable and nonarbitrable claims, district courts have "discretion whether to proceed with the nonarbitrable claims before or after the arbitration and have authority to stay proceedings in the interest of saving time and effort for itself and litigants." *Nitsch v. DreamWorks Animation SKG Inc.*, 100 F. Supp. 3d 851, 870 (N.D. Cal. 2015) (internal quotation marks and citations omitted); *see also Leyva v. Certified Grocers of California, Ltd.,* 593 F.2d 857, 863-64 (9th Cir. 1979).  "A stay is not a matter of right, even if irreparable injury might otherwise result[, but] is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (internal quotation marks and citations omitted).  "The party requesting the stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433-34.

### DISCUSSION

EIS moves to compel arbitration on an individual basis and stay this action.  DeVries presents four arguments against compelling arbitration:  (1) he did not consent to the 2014 Terms and Conditions; (2) even if he did consent, his claims fall within the carve-out to the superseding 2016 Terms of Use arbitration provision; (3) EIS waived its right to compel arbitration; and (4) the arbitration agreement is a violation of public policy.  EIS argues that DeVries did consent to the 2014 Terms and Conditions and that his remaining three arguments are for the arbitrator to decide.

## I.      EXISTENCE OF AN AGREEMENT

### A.      2014 Terms and Conditions

DeVries contends that he did not agree to the arbitration provision contained in the 2014 Terms and Conditions when he purchased his credit report online and, therefore, the required element of mutual assent is missing.  "[M]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (citing *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d

7

United States District Court
Northern District of California

1  Cir.2002)).  "Mutual assent may be manifested by written or spoken words, or by conduct, and

2  acceptance of contract terms may be implied through action or inaction."  *Knutson v. Sirius XM*

3  *Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (internal citations and quotation marks omitted)

4  (applying California law).[4]  Without mutual assent, there is no agreement to arbitrate.  EIS, "as the

5  party seeking to compel arbitration, has the burden of proving the existence of an agreement to

6  arbitrate by a preponderance of the evidence."  *Id.* at 565.

7      In general, "[c]ontracts formed on the Internet come primarily in two flavors: 'clickwrap'

8  (or 'click-through') agreements, in which website users are required to click on an 'I agree' box

9  after being presented with a list of terms and conditions of use; and 'browsewrap' agreements,

10  where a website's terms and conditions of use are generally posted on the website via a hyperlink

11  at the bottom of the screen."  *Nguyen*, 763 F.3d at 1175-76.

12      Here, on order page "Step 2 of 2," directly above the "Submit Secure Order" button, EIS

13  stated:

14          Click "Submit Secure Order" to accept the Terms and Conditions
            above, acknowledge receipt of our Privacy Notice and agree to its
15          terms, confirm your authorization for ConsumerInfo.com, Inc., an
            Experian company, to obtain your credit report and submit your
16          secure order.

17  First Williams Decl., Ex. C.  The phrases "Terms and Conditions" and "Privacy Notice" were in

18  blue, a different color than the rest of the text, indicating that they were active hyperlinks that the

19  consumer could click to be directed to another webpage.  First Williams Decl. ¶ 8.  When a

20  consumer clicked on the "Terms and Conditions" hyperlink, "an additional window would open

21  within the consumer's web browser containing the entire text of the Terms and Conditions,"

22  including the arbitration provision.  *Id.*  Thus, the Terms and Conditions "are somewhat like a

23  browsewrap agreement in that the terms are only visible via a hyperlink, but also somewhat like a

24  clickwrap agreement in that the user must do something else—click ["Submit Secure Order"]—to

25  assent to the hyperlinked terms."  *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 838 (S.D.N.Y.

26  2012).

27  —————————————

28  [4] Both parties' briefs apply California law, and I do as well.

8

The Ninth Circuit has held that "where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." *Nguyen*, 763 F.3d at 1178–79.  However, "[c]ourts have also been more willing to find the requisite notice for constructive assent where the browsewrap agreement resembles a clickwrap agreement—that is, where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website." *Id.* at 1176.  A court may find that an individual assented to an electronic agreement if "a reasonably prudent user" would have been put "on inquiry notice of the terms of the contract." *Id.* at 1177.

DeVries argues that he did not consent to or have notice of the arbitration provision "by clicking on a button that did not mention, display, link to, or otherwise reference the Terms and Conditions."  Oppo. at 4.  This argument is unpersuasive.  The text containing the Terms and Conditions hyperlink was located directly above that button and indicated that clicking "Submit Secure Purchase" constituted acceptance of those terms.  In *Tompkins v. 23andMe, Inc.*, the court found that the plaintiffs had received adequate notice of the Terms of Service ("TOS") where "during the account creation and registration processes, each named Plaintiff clicked a box or button that appeared near a hyperlink to the TOS to indicate acceptance of the TOS."  No. 13-cv-05682-LHK, 2014 WL 2903752, at *8 (N.D. Cal. June 25, 2014), *aff'd*, No. 14-16405, 2016 WL 6072192 (9th Cir. Oct. 13, 2016).  The court explained that "[t]he fact that the TOS were hyperlinked and not presented on the same screen does not mean that customers lacked adequate notice." *Id.* (citing *Fteja*, 841 F. Supp. 2d 829).

Similarly, in *Graf v. Match.com, LLC*, the court held that a plaintiff assented to an arbitration clause where evidence showed that all website users "were required to affirmatively agree to the Terms of Use when they clicked on a 'Continue' or other similar button on the registration page where it was explained that by clicking on that button, the user was affirming that they would be bound by the Terms of Use, which were always hyperlinked and available for review."  No. CV 15-3911 PA (MRWx), 2015 WL 4263957, at *4 (C.D. Cal. July 10, 2015).  *See*

United States District Court
Northern District of California

*also Crawford v. Beachbody, LLC*, No. 14-cv-1583–GPC (KSC), 2014 WL 6606563, at *3 (S.D.Cal. Nov. 5, 2014) (noting that "[c]ourts have held that a modified or hybrid clickwrap/browsewrap agreement constitutes a binding contract where the user is provided with an opportunity to review the terms of service in the form of a hyperlink immediately under the 'I Accept' button and clicks that button," and enforcing such an agreement in that case).

DeVries relies on two out of circuit cases, *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220 (2d Cir. 2016) and *Meyer v. Kalanick*, No. 15 CIV. 9796, 2016 WL 4073071 (S.D.N.Y. July 29, 2016). Both are distinguishable.[5] In *Nicosia*, Amazon's order page included a "Place your order button" on the right side of the page. 834 F.3d at 236. The top of the page stated, "By placing your order, you agree to Amazon.com's privacy notice and conditions of use." *Id.* The "privacy notice" and "conditions of use" appeared in blue as hyperlinks. *Id.* The court found that "[n]othing about the 'Place your order' button alone suggests that additional terms apply, and the presentation of terms is not directly adjacent to the 'Place your order' button so as to indicate that a user should construe clicking as acceptance." *Id.* at 236-37. Additionally, the court noted that "there appear to be between fifteen and twenty-five links on the Order Page, and various text is displayed in at least four font sizes and six colors (blue, yellow, green, red, orange, and black), alongside multiple buttons and promotional advertisements. Further, the presence of customers' personal address, credit card information, shipping options, and purchase summary are sufficiently distracting so as to temper whatever effect the notification has." *Id.* at 237. In contrast, the notice here is located "directly adjacent" to the "Submit Secure Order" button. Nor did the order page

---

[5] DeVries also submitted a Statement of Recent decision, citing *Norcia v. Samsung Telecommunications America, LLC*, 845 F.3d 1279 (9th Cir. 2017) and *Dang v. Samsung Electronics Co., Ltd.*, No. 15-16768, 2017 WL 218896 (9th Cir. Jan. 19, 2017). Statement of Recent Decision (Dkt. No. 57). Neither involved an Internet agreement. Rather, the relevant arbitration provision was provided to consumers through a warranty brochure contained in the packaging box for smartphones. Also, unlike in *Norcia* and *Dang* where the plaintiffs did not expressly agree or "otherwise act in a manner that would show '[their] intent to use silence, or failure to opt out, as a means of accepting the arbitration agreement," DeVries affirmatively clicked the "Submit Secure Order" button. *Norcia*, 845 F.3d at 1287; *see also Dang*, 2017 WL 218896, at *1.

contain a multitude of hyperlinks or other distracting content.[6]  *Nicosia* would not preclude a finding of mutual assent here.

In *Meyer*, the court found no mutual assent where an Uber registration screen "did not adequately call users' attention to the existence of the Terms of Service, let alone to the fact that, by registering to use Uber, a user was agreeing to them."  2016 WL 4073071, at *9.  Below fields to enter credit card information, a "Register" button, a "PayPal" button, and a "Google Wallet" button, the registration screen provided, "By creating an Uber account, you agree to the Terms of Service & Privacy Policy" in small font.  *Id.* at *4.  Although the "Register" button was "very user-friendly and obvious," the "statement about 'Terms of Service' appears far below and in much smaller font,"—indeed, in "a font that was barely legible on the smartphone device that a would-be Uber registrant could be expected to use."  *Id.* at *6, 8.  Here, the relevant language's proximity to the "Submit Secure Order" button and font size adequately call a reasonably prudent user's attention to the existence of the Terms and Conditions.

For these reasons, I conclude that DeVries accepted the 2014 Terms and Conditions when he purchased his credit report from EIS, and I reject DeVries's argument that no arbitration agreement exists with EIS.[7]

---

[6] DeVries points to Exhibit F-2, which paragraph 10 of the Reese Declaration states is a true and correct copy of "the Legal Terms & Conditions that appear above the Submit Secure Order button."  These terms do not contain an arbitration provision, but provide that they "are in addition to, and do not override, the specific terms and conditions that apply to the products or services offered by Experian and otherwise through this site."  Reese Decl., Ex. F-2.  DeVries contends that these terms also appeared on the 2014 order pages, thus causing confusion for a consumer. Oppo. at 5.  EIS objects to the Reese Declaration paragraph 10 as lacking foundation for this exhibit. Dkt. No. 48.  Moreover, EIS submitted a declaration providing that "[t]he 'Legal Terms and Conditions' have never been linked or displayed on the order pages that a consumer must complete to place an order."  Second Williams Decl. ¶ 2.  Rather, the hyperlinked "Terms and Conditions" above the "Submit Secure Order" button at the time DeVries purchased his credit report are those attached as Exhibit D to the First Williams Declaration.  Nor was Exhibit F-2 to the Reese Declaration "contained in the website that was in effect at the time Mr. DeVries transacted with CIC on September 2, 2014."  *Id.*  Additionally, Exhibit F-2 shows that it was accessed online on October 14, 2016, and the order pages as they appeared in 2014 do not show any hyperlinks to "Legal Terms & Conditions."  First Williams Decl., Exs. B, C.  On this record, there is no evidence that Exhibit F-2 to the Reese Declaration appeared on the order pages in 2014 or that it could  have caused confusion to a consumer.

[7] EIS requested judicial notice of multiple decisions by the Central District of California finding mutual assent to EIS's arbitration provision where the relevant terms appeared in a scroll box, rather than by hyperlink.  *See* EIS's Request for Judicial Notice in Support of Motion to Compel

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## B.    2016 Terms of Use

DeVries argues that even if he did agree to the arbitration provision in the 2014 Terms and Conditions, that agreement has been superseded by EIS's Terms of Use in effect by April 5, 2016. Oppo. at 10.  The 2016 Terms of Use arbitration provision contains a carve-out for disputes "arising out of the [FCRA] relating to the information contained in your consumer disclosure or report, including but not limited to claims for alleged inaccuracies."  Reese Decl., Ex. G.  The Terms of Use also provide:

> This Agreement . . . constitute[s] the entire Agreement between ECS and you in connection with your account with ECS, or access or use of any Service or Website, and supersede[s] any prior versions of the terms and conditions, if applicable . . . In the event of a conflict between this Agreement, or any other notice, policy, disclaimer or other term contained in the Websites or otherwise, this Agreement will control.

Reese Decl., Ex. G.  Notably, the 2014 Terms and Conditions contained a change-in-terms provision, stating that its terms "may be updated from time to time by posting revised Terms and Conditions on the Product Websites" and that "[e]ach time you order, access, or use any of the Products, Product Websites, and/or Content, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement."  First Williams Decl., Ex. D.  DeVries asserts that because he visited EIS's website on approximately May 18, 2016, and September 16, 2016 (once before he filed this lawsuit, and once after), the 2016 Terms of Use is the operative agreement governing his claims with EIS.  DeVries Decl., ¶ 2.  Neither party argues that DeVries did not assent to this agreement.

In general, courts have enforced new terms where prior agreements included change-in-terms provisions.  For instance, in *Daugherty v. Experian Information Solutions, Inc.*, the defendant bank mailed to credit cardholders a written change-in-terms notice to inform cardholders that it "was making certain changes to the cardholder agreement, including changes regarding binding arbitration of disputes and the law governing their credit cards" in 2003.  847 F.

---

(Dkt. No. 32), EIS's Request for Judicial Notice in Support of Reply (Dkt. No. 47).  A court may take judicial notice of "proceedings in other courts," and I will do so here.  *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cit. 1992).  That said, I do not rely on these decisions.

United States District Court
Northern District of California

Supp. 2d 1189, 1191 (N.D. Cal. 2012) (Armstrong, J.).  The notice also included a change of terms

provision, allowing defendant to make changes to the agreement at any time and providing that

such changes are binding unless the cardholder notifies the defendant that he or she does not agree

within 25 days. *Id.* at 1192.  In 2006, the defendant notified the plaintiff of changes to the terms

governing his agreement, including the arbitration provision. *Id.*  More than 25 days later, the

defendant received a letter from the plaintiff, requesting that his account be cancelled. *Id.*  In

2011, the plaintiff filed suit under the FCRA and California state law against the defendant bank,

as well as several credit reporting agencies, for alleged inaccuracies in his 2008 and 2009 credit

reports. *Id.* at 1192-93.  The defendant moved to compel arbitration under the 2006 cardholder

agreement. *Id.* at 1193.  Granting the motion to compel, the court found that the defendant had

expressly reserved its right to change the terms of the credit card agreement and that plaintiff had

failed to cancel his account before the new agreement became effective. *Id.* at 1195-96. *See also*

*Cayanan v. Citi Holdings, Inc.*, 928 F. Supp. 2d 1182, 1188, 1200 (S.D. Cal. 2013) (granting

motion to compel based on arbitration provision contained in notice of change of terms where the

credit cardholder did not opt-out).

Courts have also consistently applied arbitration agreements retroactively where the

agreements explicitly subsume prior agreements or facially apply to disputes arising prior to the

agreement. *In re Verisign, Inc., Derivative Litigation* is instructive. *See* 531 F. Supp. 2d 1173

(N.D. Cal. 2007) (Hamilton, J.).  There, shareholders brought a derivative action on behalf of

VeriSign against several defendants, including VeriSign's independent auditor, KPMG, for

violations related to alleged backdating of stock option grants. *Id.* at 1179, 1181.  KPMG audited

VeriSign's financial statements for fiscal years 1998 through 2005. *Id.* at 1223.  A separate

engagement letter governed KPMG's services to VeriSign for each fiscal year. *Id.*  The 2005

engagement letter contained an arbitration clause, but all previous engagement letters did not. *Id.*

The arbitration provision applied to "any dispute or claim arising out of or relating to the

engagement between the parties, the services provided thereunder, or any other services provided

by or on behalf of KPMG." *Id.*  The court rejected plaintiffs' argument that the arbitration

provision did not apply because the events underlying their claims occurred before the parties

executed the 2005 engagement letter.  *Id.* at 1224. In particular, the court emphasized that the engagement letter covered not just disputes arising out of that agreement, but also "any other services provided by or on behalf of KPMG."  *Id.*

EIS argues that these cases are distinguishable because they involved continuing business relationships but cites no law in support of this proposition.  If EIS argued that the provision was unenforceable because of the nature of DeVries's visits in 2016, I might be more sympathetic.  But EIS contends that DeVries's credit report order underlying this lawsuit (along with the 2014 Terms and Conditions, with the exception of the arbitration provision) expired after 30 days, and so there is nothing for the 2016 Terms of Use to supersede.  Reply at 10.  The 2014 Terms and Conditions provide only that a consumer could access his or her credit report or score for 30 days from the date of payment; it does not say that the Terms and Conditions expire in 30 days.  First Williams Decl., Ex. D.  Instead, the final section of the Terms and Conditions, entitled "Entire Agreement," provides that the "Terms and Conditions are effective until terminated by CIC."  *Id.* Moreover, the 2016 Terms of Use are broadly written to include any visit, whether it resulted in a transaction or not.  Reese Decl., Ex. G.

Equally unpersuasive is EIS's argument that that the Terms of Use govern only claims that DeVries may assert arising from his 2016 visits to the website.  Reply at 10.  The Terms of Use explicitly include in its agreement to arbitrate "claims that arose before this or any prior Agreement," unless such claims fall within the carve-out provision.  Reese Decl., Ex. G. Therefore, I find that the 2016 Terms of Use is the operative agreement.

## II.     DELEGATION OF ARBITRABILITY DETERMINATIONS

DeVries offers three additional arguments against the motion to compel arbitration:  (1) the claims fall within the 2016 Terms of Use arbitration carve-out; (2) EIS waived its right to enforce the arbitration provision; and (3) the arbitration provision is a violation of public policy. However, EIS asserts that I cannot decide these issues because the arbitration provision delegates questions of arbitrability to the arbitrator.  Reply at 8.

14

1   "The [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of

2   arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24-25.

3   Nevertheless, "so-called 'question[s] of arbitrability' [ – ] which include certain gateway matters,

4   such as whether parties have a valid arbitration agreement at all or whether a concededly binding

5   arbitration clause applies to a [particular] controversy [ – ] are presumptively for courts to decide."

6   *Oxford Health Plans LLC v. Sutter*, 133 S.Ct. 2064, 2068 n.2 (2013) (some internal quotation

7   marks omitted); *see also Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011) (issues that

8   "contracting parties would likely have expected a court to have decided" are "gateway questions

9   of arbitrability" to be determined by the court, not the arbitrator).  This rule flows from the

10   "principle that a party can be forced to arbitrate only those issues it specifically has agreed to

11   submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945 (1995).

12       "Although gateway issues of arbitrability presumptively are reserved for the court, the

13   parties may agree to delegate them to the arbitrator." *Momot*, 652 F.3d at 987.  In other words,

14   parties can "agree to arbitrate" questions of arbitrability.  *Rent-A-Ctr., W., Inc. v. Jackson*, 561

15   U.S. 63, 68-69 (2010) (internal quotation marks omitted).  For arbitration agreements governed by

16   the FAA, courts considering whether the parties have agreed to arbitrate questions of arbitrability

17   "should apply federal arbitrability law absent clear and unmistakable evidence that the parties

18   agreed to apply nonfederal arbitrability law." *Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d

19   914, 921 (9th Cir. 2011) (internal quotation marks omitted).  Under federal arbitrability law,

20   "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability),

21   courts . . . should apply ordinary state law principles that govern the formation of contracts." *First*

22   *Options*, 514 U.S. at 944.  Because questions of arbitrability are presumptively for courts to

23   decide, however, courts "apply a more rigorous standard in determining whether the parties have

24   agreed to arbitrate [such] question[s]." *Momot*, 652 F.3d at 987.  "Courts should not assume that

25   the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they

26   did so." *First Options*, 514 U.S. at 944 (internal quotations marks and alterations omitted).

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The Ninth Circuit has found certain language to be "clear and unmistakable evidence" of

2  parties' intent to arbitrate questions of arbitrability.  For instance, in *Momot*, the delegation clause

3  provided:

> If a dispute arises out of or relates to this Agreement, the
> relationships that result from this Agreement, the breach of this
> Agreement *or the validity or application of any of the provisions of
> this Section 4*, and, if the dispute cannot be settled through
> negotiation, the dispute shall be resolved exclusively by binding
> arbitration.

7  *Momot*, 652 F.3d at 988 (original emphasis).  The court held that the italicized language

8  delegating to arbitrators the authority to decide "the validity or application of any provisions of"

9  the arbitration clause constituted a clear and unmistakable agreement to arbitrate the question of

10  arbitrability.  *Id.*

    In *Mohamed v. Uber Technologies, Inc.*, the relevant arbitration provisions stated:

> Such disputes include without limitation disputes arising out of or
> relating to interpretation or application of this Arbitration Provision,
> including the enforceability, revocability or validity of the
> Arbitration Provision or any portion of the Arbitration Provision.

14  No. 15-16178, 2016 WL 7470557, at *3 (9th Cir. Dec. 21, 2016).  The Ninth Circuit, noting that

15  this language was "more expansive" than that in *Momot*, held that this delegation provision "also

16  clearly and unmistakably indicates the parties' intent for the arbitrators to decide the threshold

17  question of arbitrability."  *Id.* at *4 (internal quotation marks omitted).

18    I find that the delegation provision here resembles that in *Mohamed* and constitutes clear

19  and unmistakable evidence that the parties agreed that the arbitrator will decide the questions of

20  arbitrability.  The 2016 Terms of Use state:

> All issues are for the arbitrator to decide, including the scope and
> enforceability of this arbitration provision as well as the
> Agreement's other terms and conditions, and the arbitrator shall
> have exclusive authority to resolve any such dispute relating to the
> scope and enforceability of this arbitration provision or any other
> term of this Agreement, including, but not limited to any claim that
> all or any part of this arbitration provision or Agreement is void or
> voidable.

25  Reese Decl., Ex. G.[8]  The parties have not identified any conflicting terms in the remainder of the

26  agreement that would make the issue of delegation ambiguous.

27  ───────────────────

28  [8] The 2014 Terms and Conditions contain the same delegation clause.  First Williams Decl., Ex.
D.

In regards to DeVries's argument about the carve-out provision, there is no question that claims within the carve-out provision are for the court, rather than the arbitrator, to decide. But the delegation clause reserves for the arbitrator the issues of scope and enforceability. Therefore, the determination of which, if any, of DeVries's claims fall within the carve-out is an issue that the parties clearly and unmistakably delegated to the arbitrator to decide in the first instance. *See Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1076 (9th Cir. 2013) (holding that the determination of whether claims fell within the arbitration provision carve-out was delegated to the arbitrator). Similarly, the issue of whether the arbitration agreement violates public policy goes to whether the arbitration agreement is enforceable, void, or voidable and is, therefore, also for the arbitrator to decide.

However, the parties did not clearly and unmistakably delegate to the arbitrator the issue of waiver by litigation conduct. In *Cox v. Ocean View Hotel Corp.*, the arbitration agreement provided that "[a]ny controversy . . . involving the construction or application of the terms, provisions, or conditions of this Agreement or otherwise arising out of or related to this Agreement shall likewise be settled by arbitration." 533 F.3d 1114, 1117 (9th Cir. 2008). Evaluating this language, the Ninth Circuit found that the court, not the arbitrator, should decide the issue of waiver. *Id.* at 1121. In *Martin v. Yasuda*, the Ninth Circuit similarly found that an agreement providing that "[a]ll determinations as to the scope, enforceability and effect of this arbitration agreement shall be decided by the arbitrator, and not by a court" was "insufficient to show intent that an arbitrator decide the waiver by litigation conduct issue and to overcome the presumption to the contrary." 829 F.3d 1118, 1120, 1124 (9th Cir. 2016). Because the delegation provision at issue here resembles that at issue in *Martin*, I should resolve the issue of waiver.[9]

EIS argues that the issue of waiver is left to the arbitrator because the Terms and Conditions incorporate the American Arbitration Association's (AAA) Commercial Dispute

---

[9] This finding is not inconsistent with *Mohamed*, where the Ninth Circuit noted, without deciding, that the "arbitration agreements may not have clearly and unmistakably delegated to the arbitrator the authority to decide the question of waiver by litigation conduct." 2016 WL 7470557, at *4 n.4.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes.  Rule

2   7(a) of the Commercial Rules states that the "arbitrator shall have the power to rule on his or her

3   own jurisdiction, including any objections with respect to the existence, scope, or validity of the

4   arbitration agreement or to the arbitrability of any claim or counterclaim."  Reply at 9 n.6.

5   Evaluating the same language, the Ninth Circuit has held that "incorporation of the AAA rules

6   constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate

7   arbitrability."  *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).

8          Although *Brennan* stated that it did "not foreclose the possibility that this rule could also

9   apply to unsophisticated parties or to consumer contracts," the court limited its holding to the facts

10  of its case involving an arbitration agreement between sophisticated parties.  *Id.* at 1130-31.  The

11  Ninth Circuit "has *not* determined whether incorporation of the AAA rules can be clear and

12  unmistakable evidence of delegation of arbitrability where one party is an unsophisticated

13  consumer."  *Ingalls v. Spotify USA, Inc.*, No.16-cv-3533-WHA, 2016 WL 6679561, at *3 (N.D.

14  Cal. Nov. 14, 2016) (original emphasis).  However, "[e]very district court decision in our circuit to

15  address the question since *Brennan* has held that incorporation of the AAA rules was insufficient

16  to establish delegation in consumer contracts involving at least one unsophisticated party."  *Id.*

17  (collecting cases).  EIS has not argued that DeVries is a sophisticated party rather than an ordinary

18  consumer.  And "[e]ven in circuits that have concluded that incorporation of the AAA rules

19  constitutes a clear and unmistakable agreement that the parties will arbitrate arbitrability, courts

20  have properly addressed the question of waiver through litigation conduct despite incorporation of

21  the AAA rules."  *Money Mailer, LLC v. Brewer*, No. C15-1215RSL, 2016 WL 1393492, at *3

22  (W.D. Wash. Apr. 8, 2016) (citing *Plaintiff's Shareholders Corp. v. S. Farm Bureau Life Ins. Co.*,

23  486 Fed. Appx. 786, 789-90 (11th Cir. 2012)); *see also Cox*, 533 F.3d at 1117, 1121 (court

24  resolving waiver by litigation issue despite delegation clause and where the arbitration provision

25  incorporated the AAA Model Employment Arbitration Procedures).  Incorporation of the AAA

26  Rules here does not require that the issue of waiver be decided by the arbitrator.

27

28

In sum, the issues of whether DeVries's claims fall within the arbitration carve-out and whether the arbitration agreement violates public policy are for the arbitrator.  I will resolve the issue of waiver below.

## III.   WAIVER

"A determination of whether the right to compel arbitration has been waived must be conducted in light of the strong federal policy favoring enforcement of arbitration agreements." *Martin*, 829 F.3d at 1124 (internal quotation marks omitted).  A party arguing waiver of the ability to arbitrate "bears a heavy burden of proof" and must demonstrate three factors:  "(1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts."  *Id.*  (citing *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir. 1986)).[10]

### A.   Knowledge

DeVries asserts that EIS knew of its right to arbitrate because it drafted the Terms and Conditions of the arbitration provision.  Oppo. at 14.  He also argues that EIS had all the necessary information to determine whether it could arbitrate DeVries's claims because the Complaint provided Devries's name and city of residence.  Oppo. at 15.  Every person who purchased an Experian credit report in 2014—when DeVries bought his report—had to accept the Terms and Conditions, which included an arbitration provision.  Oppo. at 15 (citing First Williams Decl. ¶ 4).

---

[10] The Ninth Circuit has also expressed the test for waiver under California law as a six-factor inquiry:

> In determining waiver, a court can consider (1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place; and (6) whether the delay affected, misled, or prejudiced the opposing party.

*Cox*, 533 F.3d at 1124 (citing *St. Agnes Med. Ctr. v. PacifiCare of Cal.*, 31 Cal.4th 1187 (2003)) (alteration in original).  EIS argues that this is the appropriate test to apply, rather than the three-factor test applied in *Martin*.  Under either test, I find that EIS did not waive its right to arbitration.

United States District Court
Northern District of California

1    DeVries contends that EIS "could easily have checked its accounting records to determine whether

2    DeVries made a purchase."  Oppo. at 15.

3          EIS contends that it did not have the information it needed to determine whether DeVries

4    had entered into a contract with an arbitration provision.  Reply at 12.  "In order to verify that a

5    particular consumer purchased products from CIC, CIC needs additional identifying information

6    beyond a consumer's name, such as the address, date of birth or social security number entered in

7    the order process."  First Williams Decl. ¶ 16.  Despite repeated requests from EIS starting June

8    17, 2016, DeVries's counsel did not provide this information until September 13, 2016.

9    Declaration of Kerry C. Fowler (Dkt. No. 31-1) ¶¶ 3-12.  Once EIS received this information, it

10   was able to determine that DeVries had agreed to arbitrate its claims.  *Id.* ¶ 13.

11          **B.  EIS Did Not Engage in Acts Inconsistent with the Right to Arbitrate**

12          DeVries filed his Complaint on June 2, 2016.  EIS filed its answer on August 16, 2016,

13   asserting 14 affirmative defenses and reserving its right to assert additional defenses "as may

14   become available or apparent during the course of discovery."  Answer at 17.  It did not plead

15   arbitration as an affirmative defense.  The parties have also engaged in meet and confer

16   discussions on several occasions concerning discovery and case management scheduling.  Reese

17   Decl. ¶ 3.  I issued an order governing the treatment of confidential discovery (Dkt. No. 28).  On

18   September 8, 2016, DeVries served its First Set of Interrogatories and First Set of Requests for

19   Production of Documents.  Reese Decl. ¶ 5.  On September 13, 2016, DeVries's counsel

20   responded to EIS's requests for his identifying information in a document titled "Plaintiff's

21   Response to Defendant's Discovery Request (Interrogatory No. 1).  Reese Decl. ¶ 4; Fowler Decl.,

22   ¶¶ 3-12.  On September 19, 2016, the parties served their respective initial disclosures pursuant to

23   Federal Rule of Civil Procedure 26(a).  Reese Decl. ¶¶ 8-9.  EIS filed its motion to compel

24   arbitration on September 21, 2016, and I granted its request to stay discovery pending the

25   resolution of this motion.

26          DeVries argues that EIS acted inconsistently with its right to arbitrate because EIS:  (1)

27   failed to plead arbitration as an affirmative defense, and (2) took advantage of the litigation

28   process.  Oppo. at 16.  EIS responds that it could not have pleaded arbitration as an affirmative

United States District Court
Northern District of California

20

1   defense in good faith without first verifying the existence of an arbitration agreement with

2   DeVries.  To do so, it needed DeVries's identifying information, which it did not receive until

3   September 13, 2016.  Because EIS was waiting for DeVries's identifying information, I agree with

4   EIS that its failure to plead arbitration as an affirmative defense does not amount to waiver.

5   Absent a showing of prejudice, the fact that EIS "failed to raise an affirmative defense is

6   inadequate by itself to support a claim of waiver of arbitration."  *Fisher v. A.G. Becker Paribas,*

7   *Inc.*, 791 F.2d 691, 698 (9th Cir. 1986).

8          Additionally, I find that EIS did not take advantage of the litigation process.  Courts have

9   found waiver through litigation conduct where a party unreasonably delayed moving to compel

10  arbitration and actively litigated the case.  For instance, in *Martin*, the Ninth Circuit found

11  defendants engaged in conduct inconsistent with their right to arbitrate where they spent 17

12  months litigating the case, including "devoting 'considerable time and effort' to a joint stipulation

13  structuring the litigation, filing a motion to dismiss on a key merits issue, entering into a protective

14  order, answering discovery, and preparing for and conducting a deposition."  829 F.3d at 1126.

15         In contrast, EIS did not unreasonably delay filing its motion to compel arbitration; rather,

16  the motion was filed less than four months after the complaint, and just one week after obtaining

17  DeVries's identifying information and confirming the existence of an arbitration agreement.  Nor

18  has EIS taken advantage of judicial discovery procedures not available in arbitration.  At this

19  point, EIS has not served any interrogatories or requests for production.  It has only received

20  DeVries's identifying information and his initial disclosure.  Further, the parties have not litigated

21  any other motion.  EIS's conduct is not inconsistent with its right to arbitrate.

22         **C.  Prejudice to Plaintiffs**

23         A plaintiff seeking to show waiver of the right to arbitrate must demonstrate that he was

24  prejudiced by litigation conduct inconsistent with the right to arbitrate.  The Ninth Circuit has

25  explained:

26             To prove prejudice, plaintiffs must show more than "self-inflicted"
               wounds that they incurred as a direct result of suing in federal court
27             contrary to the provisions of an arbitration agreement. Such wounds
               include costs incurred in preparing the complaint, serving notice, or
28             engaging in limited litigation regarding issues directly related to the
               complaint's filing, such as jurisdiction or venue. In contrast, in order

United States District Court
Northern District of California

21

> to establish prejudice, the plaintiffs must show that, as a result of the defendants having delayed seeking arbitration, they have incurred costs that they would not otherwise have incurred, that they would be forced to relitigate an issue on the merits on which they have already prevailed in court or that the defendants have received an advantage from litigating in federal court that they would not have received in arbitration.

*Martin*, 829 F.3d at 1126 (internal citations omitted).

DeVries contends that he is prejudiced because he and his counsel "have expended a significant amount of time and resources." Oppo. at 18. However, he has failed to show that any expenses are more than just "self-inflicted wounds" from suing in federal court. *See Martin*, 829 F.3d at 1126. DeVries also argues that he is prejudiced because EIS "has used the litigation to receive discovery that it would not receive in arbitration, as well as have court orders and other procedures set in place that it would not be entitled to in arbitration." Oppo. at 18. Not so. EIS has only received DeVries's intial disclosure and his identifying information (his date of birth, address, and Social Security number). DeVries has not shown that EIS received an advantage from this basic information. And there have not been any orders going to the merits of DeVries's claims such that arbitration would prejudice him. DeVries has not met his "heavy burden" to show that EIS waived its right to arbitration.

## CONCLUSION

For the reasons discussed above, EIS's motions to compel arbitration and stay are GRANTED. This action will be stayed pending completion of the arbitration. Should the arbitrator determine that some or all of DeVries's claims fall within the carve-out provision, the parties shall notify the Court within seven days. Otherwise, the parties shall file a Status Report six months from the date of this Order, and every six months thereafter, briefly indicating the progress of the arbitration.

**IT IS SO ORDERED.**

Dated: February 24, 2017



William H. Orrick
United States District Judge